## Saylor et al. v. Saylor.

Jan. 26, 1940.

James M. Gilbert, Judge.

J. L. Williams and W. T. Davis for appellants.

John B. Carter and James S. Forester for appellee.

OPINION OF THE COURT BY JUDGE TILFORD—Affirming.

Charging that a deed purporting to have been executed by her deceased father on January 5, 1934, conveying practically all of his large landed estate to her mother was never in fact executed or delivered by him but "came into possession" of her mother, if at all, on

or about November 5, 1937, at which time her father lacked mental capacity to execute a deed, the appellant, Aretha Saylor, and her husband, Isom Saylor, together with a niece, the child of a deceased sister, instituted this suit against the mother, the appellee, Elizabeth Saylor, seeking a cancellation of the instrument. The petition also contained the somewhat inconsistent charge "the pretended execution and delivery of the aforesaid deed" was procured by false and fraudulent representations "that induced and caused said decedent and upon which statements he did rely in making and executing said deed." Shortly after the institution of the suit the niece withdrew, and appellee filed an answer traversing the allegations of the petition, and the action developed into a contest between Aretha on the one side, and the mother supported by her remaining children on the other. The testimony was heard orally by the Chancellor who delivered a carefully prepared written opinion and dismissed the petition. This appeal followed.

We are asked to reverse this judgment because of the alleged error of the Chancellor in refusing to rule that the burden of proof shifted to appellee after appellants had introduced witnesses whose testimony established the confidential relationship existing between appellee and her husband; and because the evidence is insufficient to sustain the deed. In an equity case heard orally by the Chancellor, it is wholly immaterial whether or when the burden shifts, provided the Chancellor hears all of the testimony offered and renders a correct decision. Since no complaint is made of the sufficiency of the pleadings and the applicable principles of law are well settled, the questions for decision presented by this appeal are questions of fact, which, in the order of their importance, may be stated as follows: (1) Was the deed executed and delivered by Andrew Saylor, and, if so, when? (2) If executed by him, was it freely and voluntarily executed, and was he possessed of sufficient mental capacity to understand the nature and consequences of his act? The answers which a court of justice in the absence of infallibility and uninfluenced by sympathy must make to these questions, will be apparent, we believe, from the following resumé of the facts as they are disclosed by the record before us.

Andrew Saylor, called Andy, was seventy-three

years of age at the time of his death, which occurred in his home, surrounded by his wife and at least most of his children, on November 22, 1937. He was uneducated in the sense that he could neither read nor write, but, notwithstanding this handicap, had through his native resourcefulness, intelligence, and business ability, acquired an estate of approximately $100,000. He appears to have been an affectionate husband and father, particularly fond of his wife, who, like him, was uneducated, and to have held the respect of all of his ten living children, with the possible exception of Aretha, who, shortly before his death, had incurred his displeasure through her successful independent candidacy for the office of magistrate in the 1937 general election, defeating her brother, Gillis, who in turn had defeated her husband, Isom, the incumbent, for the Republican nomination in the primary. One of his sons, Morris, was County Judge of Harlan County, and his son, Grant, was a deputy county court clerk, and on these sons he seems to have particularly relied for help in the management of his business affairs. His physical condition had been impaired by an organic heart lesion and prostate trouble for about eight years prior to his death, but his physician testified, and this is the only medical testimony on this subject in the record, that he was "mentally alert" until about ten days before his death. Indeed, his mentality never seems to have been questioned prior to the summer of 1937 when he went to Knoxville for treatment. During his final illness, and about two and a half weeks before his death he sent for the officials of his bank and transferred his savings account of over $14,000 to his wife. It is claimed by the appellants that on November 5th, the day before the deed in question was recorded, Grant came to his father's house, requested that those present in the sick room leave it, and informed his father that an execution had been "raised" against him which would break him up and that he had better arrange his affairs and make his property over to appellee, and thus induced him to execute the deed conveying the real estate to his wife, believing that it was necessary so to do in order to avoid a levy on his property, when, in fact, Grant's real motive was to consummate a conspiracy between the mother and the sons to deprive Aretha of her share of her father's estate. But

appellants were unable to prove this charge, and their efforts to do so consisted mainly in attempting to contradict certain members of the family whom appellants claim had eavesdropped after leaving the room and stated to Aretha that they would testify that they had overheard Grant tell his father that it was necessary that he execute a deed conveying the property to his mother. Grant vehemently denies any such transaction, and explains that the occasion on which he requested those present to leave the room was that on which he discussed with his father the plan for carrying into effect his father's desire to transfer the savings account to his wife. But, be this as it may, the evidence falls far short of establishing either that the execution of the deed was suggested on this occasion, or that it was executed during the last illness of the father, or on any date other than the date on which it purports to have been acknowledged, namely, January 5, 1934. The remainder of the proof introduced by appellants consists of the testimony that Aretha was denied the privilege of seeing her father during his illness, of the ill feeling engendered in the mother and sons by reason of Aretha having defeated Gillis for the office of magistrate, of statements alleged to have been made by the mother evidencing this ill feeling, and of statements alleged to have been made by the father subsequent to January 5, 1934, to the general effect that he had not settled his affairs but intended to do so and divide his estate among all of his children. It was also shown that the property subsequent to January 5, 1934, was reported for assessment by the father as belonging to him; that he had sold certain small portions of the real estate embraced in the deed without referring in the deed to the alleged prior deed to his wife, and that when some members of the family had suggested to him that Aretha should be denied participation in his estate he had repudiated the suggestion saying that she was "one of us." Many of the statements alleged to have been made by the father relative to his ownership of the property subsequent to January 5, 1934, were incompetent because they were self-serving and not made in the presence of the appellee; but giving full weight to all of the testimony introduced by the appellants in support of their claim, it was nevertheless insufficient to show mental incapacity of

any kind prior to the summer of 1937, or to overcome the testimony of the appellee and her witnesses that the conveyance was executed on January 5, 1934. Indeed, the question of when the deed was executed is the vital question in the case, as apparently no ill feeling existed against Aretha prior to the summer of 1937, and there is no evidence of probative value indicating that the father's mentality was in any degree affected prior to that time.

It is true that the deed was not recorded until November 6, 1937, and that the acknowledgment purports to have been taken by Grant, who, as above stated, was a deputy county clerk, and that these facts, coupled with the resentment toward Aretha, are sufficient to cast suspicion upon the transaction. If the proof had sustained the charge that the deed was in fact executed in November, 1937, after the father's mentality had become affected, we would have no hesitancy in directing that it be set aside, but the controlling feature in this case which prevents a cancellation of the deed is the conclusive evidence introduced by appellee that the deed was executed on January 5, 1934, at a time, when the father was indisputably of strong mentality and no ill feeling had arisen against Aretha. The conclusive testimony referred to is that of Bert A. Howard, a young lawyer, who typed the deed at the request of Grant in Judge Morris Saylor's office on the date stated in the deed; the testimony of Judge Morris Saylor that he saw the deed when it was typed on the date referred to, testimony of Grant Saylor who testified that the deed was written as testified to by Howard, that he took his father's acknowledgment on the date certified by him, and that the deed was prepared at the direction of his father who made his mark thereon; the testimony of J. S. Forrester, one of the attorneys for the appellee in this case, who on numerous occasions had represented Andrew Saylor, that the deed was exhibited to him in September, 1937, by Grant Saylor and Judge Morris Saylor who brought it to the office of Forrester & Carter that it might be inspected by the attorneys in order to ascertain if it was in proper form; by the testimony of his physician, Dr. Brooks, that approximately two years before his death Andrew Saylor had told him that he had left all his property to his "old woman;" and by the testimony of

the appellee, John Henry Saylor, a son, and a daughter, Elizabeth Saylor, that they saw the deed executed.

No consideration was necessary to support the conveyance, since any adult person possessed of sufficient mental capacity to understand the nature and consequences of his act may of his own free will, for any lawful consideration he sees fit to accept, convey his property to whomsoever he chooses. Moreover, it was but natural that Andrew Saylor should have made this conveyance considering the threat to his health which then existed and his devotion to his wife who had assisted him in accumulating what he possessed. We sympathize with Aretha's predicament, but, as said by the Chancellor in his opinion:

> "The fact that the mother may not deal justly with her daughter Aretha Saylor is a question that appeals to her conscience. It has been shown that the mother had transferred to her a considerable sized bank account that was in the father's name prior to his death, and that there has been a partial distribution of this money among all of her children except Aretha Saylor, and it is argued that that is sufficient to show that the mother would not be fair to her daughter, Aretha, but the difficulty with that is, if this deed was the act and deed of Andrew Saylor when made, executed and delivered his act was final. It was his property and he had the right to dispose of it according to his own judgment, and the fact that he later fell out with his daughter because of her political attitude cannot change the rights of the parties nor the law of the case, if he made the deed at the time that he was in control of his mental faculties and not improperly influenced by such. * * * It is regretable that these difficulties have arisen in this family. They are matters that ought to be adjusted in the spirit of fairness and justice to each other, matters that the court cannot deal with now, if the deed was executed and delivered as the evidence shows that it was."

Judgment affirmed.